# IN THE SUPREME COURT OF TEXAS

═══════════

No. 18-0664

═══════════

PRSI TRADING, LLC, PETITIONER,

v.

HARRIS COUNTY, TEXAS, RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════════

**Argued December 5, 2019**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

JUSTICE BOYD and JUSTICE BLAND did not participate in the decision.

The federal Foreign-Trade Zones Act of 1934[1] provides for the designation of duty-free areas of operation in or near United States ports of entry. The Act exempts goods imported from outside the United States and held within a zone for certain purposes from state and local ad valorem taxation.[2] The court of appeals held that the exemption did not apply to petitioner's imported crude

---

[1] 19 U.S.C. §§ 81a–81u.

[2] *Id.* § 81o(e).

oil and refinery products because the zone involved was not activated at the time.[3] We disagree and therefore reverse the judgment of the court of appeals and render judgment for petitioner.

## I

*Foreign-trade zones (FTZs)* are located in the United States, but goods imported into the zones are not subject to tariffs or duties until they leave.[4] Goods in FTZs may be processed and incorporated into finished products bearing lower tariffs than the original goods. Postponing the imposition of tariffs often results in a lower finished-good cost, thus encouraging manufacturing in the United States instead of abroad.[5]

The Act authorizes a Board to create FTZs.[6] Customs and Border Protection supervises the operation of the FTZs the Board creates.[7] The Board may also create subzones—limited-purpose zones established outside the confines of existing FTZs that enjoy the same status and benefits as general-purpose zones.[8]

---

[3] 579 S.W.3d 77, 84–85 (Tex. App.—Houston [1st Dist.] 2017).

[4] *See* 15 C.F.R. § 400.1(c); *see also* U.S. CUSTOMS AND BORDER PROT., DEP'T OF HOMELAND SEC., PUB. NO. 0000-0559A, FOREIGN-TRADE ZONES MANUAL § 1.1 (2011) [hereinafter FTZM].

[5] *See* Scott H. Segal & Stephen J. Orava, *Playing the Zone and Controlling the Board: The Emerging Jurisdictional Consensus and the Court of International Trade*, 44 AM. UNIV. L. REV. 2393, 2402–2404 (1995); *About Foreign-Trade Zones*, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/border-security/ports-entry/cargo-security/cargo-control/foreign-trade-zones/about (last visited Feb. 18, 2020).

[6] 19 U.S.C. §§ 81a(b), 81b(a).

[7] FTZM § 1.1.

[8] 15 C.F.R. § 400.3(a)(2). Subzones are usually private plant sites authorized by the Board for operations that cannot be accommodated within an existing general-purpose FTZ. *About Foreign-Trade Zones*, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/border-security/ports-entry/cargo-security/cargo-control/foreign-trade-zones/about (last visited Feb. 18, 2020).

Putting an FTZ into operation is a two-stage process. The Board first approves a *grantee* to establish, operate, and maintain the zone.[9] Customs then must vet and approve an *operator* and *activate* the zone to allow goods to be admitted with *zone status*.[10] Importantly, zone benefits, such as the ad valorem tax exemption, do not accrue until Customs activates the zone.[11] Under the regulations, activation requires approval of the zone's grantee.[12] The terms operator and activation go hand in hand in the FTZ regulations; a party only operates an activated zone and an activated zone must have an operator.[13]

In 1995, the Board approved the Port of Houston Authority as grantee of Subzone 84-N, which consists of a refinery and connected facilities in Pasadena, Texas that are used to store imported crude oil and refined petroleum products. Customs activated Subzone 84-N with the refinery's original owner, Crown Central Petroleum Corporation, as operator. In 2004, Crown sold the refinery to Pasadena Refining System, Inc., a Delaware corporation, which we will call *Pasadena-DE*. The Port of Houston agreed for Pasadena-DE to replace Crown as operator of Subzone 84-N, and Customs approved the change in February 2005.[14]

---

[9] FTZM § 4.1.

[10] *Id.*; *see also* 19 C.F.R. § 146.6 (setting forth the procedures for activation).

[11] FTZM § 4.1 ("Only after the approval of activation will Users gain the benefits conferred under the FTZ Act.").

[12] 19 C.F.R. § 146.1(b) ("'Activation' means approval by the grantee and port director for operations and for the admission and handling of merchandise in zone status.").

[13] *See* FTZM § 4.6 ("An FTZ may commence operations after approval by the Port Director of an application to activate [pursuant to 19 C.F.R. § 146.6]."); *id.* § 4.7(a) ("An Operator . . . shall make written application to the local Port Director to obtain approval for activation of an FTZ or FTZ site.").

[14] 19 C.F.R. § 146.6(b)(5) (requiring written concurrence of the grantee when an operator applies for activation).

3

Some 18 months later, in August 2006, Pasadena-DE merged into its parent, which in turn simultaneously merged into its parent, a Connecticut corporation, which then changed its name to Pasadena Refining System, Inc., the same as Pasadena-DE's. We will refer to the new entity as *Pasadena*. Pasadena applied to Customs for approval to become the new operator of Subzone 84-N,[15] but by that time, the Port of Houston had changed its policy to withhold concurrence unless Harris County did not object to the proposed operator's application. Harris County would not provide a letter of nonobjection to the Port unless Pasadena first agreed to waive its right to the FTZ ad valorem tax exemption. Pasadena refused and instead changed positions, asserting in a statement to Customs that it was not a new operator after all and therefore was not required to follow the procedures in the FTZ regulations for activation of a zone, which require the Port's agreement.[16]

Pasadena continued operations in Subzone 84-N, just as Pasadena-DE had.[17] The Appraisal District continued the operation's tax exemption. On September 21, 2009, Customs issued a letter ruling that Pasadena-DE had ceased to exist in August 2006 as a result of the mergers, that Pasadena was a new entity that had to apply for approval and activation, and that the Port's concurrence was required. Pasadena sought administrative review of the letter ruling and continued to press its case with Customs that it should not be considered a new operator because it had succeeded to all of

---

[15] Pasadena's FTZ administrator, Jon Mattson, testified by affidavit that Pasadena applied to Customs for reapproval out of an "abundance of caution" and because it believed approval would be "automatic" given its close relation to Pasadena-DE.

[16] 19 C.F.R. § 146.6.

[17] A sister entity, petitioner PRSI Trading, LLC, owned the crude oil imported into the zone and the products refined from it. Our references to Pasadena include PRSI Trading unless the context indicates otherwise.

Pasadena-DE's rights and privileges as a matter of state law.[18] Over five years, from April 2008 to April 2013, Customs issued 53 monthly letters giving Pasadena temporary authorization to operate and move goods through Subzone 84-N with zone status. The Appraisal District continued the tax exemption unchanged.

Finally, in April 2013, Customs issued a second letter ruling reaffirming that Pasadena was a new corporate entity and that it was therefore required to apply for approval to operate Subzone 84-N.[19] In response, the Port of Houston, which still refused to concur in the application, requested for the first time that Customs deactivate the zone. Customs began the process, which was completed in August 2013. Pasadena removed its inventory, and the Appraisal District ceased to recognize the tax exemption.

Harris County petitioned the Harris County Appraisal Review Board for a determination that Pasadena's operations in Subzone 84-N had never been tax-exempt because Pasadena had never qualified as the operator after the merger and that the County was owed taxes from 2011 through 2013.[20] The Appraisal Review Board denied relief, and Harris County brought this action for judicial

---

[18] Pasadena filed a request for reconsideration, arguing that it should not be considered a new operator because (1) Pasadena-DE "continues to exist as part of" Pasadena; (2) Pasadena-DE's rights and privileges vested in Pasadena as a result of the mergers; and (3) Pasadena was operating identically to Pasadena-DE in all material respects.

[19] *See* FTZM § 4.13(a) ("If the [operator] is a corporation and the change results in a new corporate entity, a new application for activation shall be made under the procedures in 19 CFR 146.6".). The 2009 and 2013 letter rulings are in Appendix D to Petitioner's Brief on the Merits.

[20] Harris County sought relief under § 25.21 of the Texas Tax Code, which allows an appraisal district to add personal property omitted from the appraisal roll for the two years preceding the challenge.

review.[21] The trial court granted Pasadena's and the Appraisal District's summary judgment motions and denied Harris County's.

The court of appeals reversed and rendered judgment in favor of Harris County.[22] The court concluded that "[w]ithout activation of Subzone 84-N pursuant to approval of a new operator, [Pasadena's] inventory could not have been properly admitted into the subzone, and, thus, was not entitled to exemption from ad valorem taxation."[23] We granted Pasadena's petition for review.

## II

The parties' dispute can be distilled down to one question: Was Subzone 84-N activated during the tax years at issue? If it was, all agree that the ad valorem tax exemption applies to Pasadena's inventory.

## A

Under the Act, "[t]angible personal property" that is "held in a zone" for certain enumerated purposes "shall be exempt from State and local ad valorem taxation."[24] Though the Act does not define "held in a zone", it gives the Board and Customs authority to make rules governing the use

---

[21] TEX. TAX CODE § 42.031(a) ("A taxing unit is entitled to appeal an order of the appraisal review board determining a challenge by the taxing unit.").

[22] 579 S.W.3d 77, 79 (Tex. App.—Houston [1st Dist.] 2017).

[23] *Id.* at 85.

[24] 19 U.S.C. § 81o(e); *see also* TEX. TAX CODE § 11.12 ("Property exempt from ad valorem taxation by federal law is exempt from taxation.").

6

and operation of FTZs.[25] These regulations, set out in the Code of Federal Regulations and summarized in the FTZ Manual, comprise the scheme by which FTZs are governed.[26]

The regulations are clear. Imported goods must be admitted into a zone to be entitled to the tax exemption.[27] Goods may only be admitted into a zone that has been activated.[28] Activation, in turn, requires approval by the grantee.[29] Once Customs approves an operator's application for activation and accepts an executed bond, the zone is considered activated, goods can be admitted, and the benefits conferred under the Act begin to flow.[30] If another party later seeks to take over as the operator of an existing zone, it must apply for approval of a new activation.[31] An operator that undergoes a change that results in a new corporate entity must also apply for approval of a new activation.[32]

---

[25] 19 U.S.C. § 81h.

[26] "The Foreign-Trade Zones Act is administered through two sets of regulations, the FTZ Regulations (15 CFR Part 400) and [Customs] Regulations (19 CFR Part 146)." *About Foreign-Trade Zones*, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/border-security/ports-entry/cargo-security/cargo-control/foreign-trade-zones/about (last visited Feb. 18, 2020). The FTZ Manual paraphrases the regulations "for the sake of simplicity and easier reading." FTZM at 2. In that spirit, our references to *FTZ regulations* include those in 15 C.F.R., 19 C.F.R., and the Manual.

[27] 15 C.F.R. § 400.1(c); *see also* 19 C.F.R. § 146.1(b) ("'Admit' means to bring merchandise into a zone with zone status.").

[28] 19 C.F.R. § 146.6(e) ("Upon the port director's approval of the application and acceptance of the executed bond, the zone or zone site will be considered activated; and merchandise may be admitted to the zone.").

[29] *Id.* § 146.1(b).

[30] *Id.* § 146.6(e); FTZM § 4.1.

[31] 19 C.F.R. § 146.1(b) ("If the operator is different, it is an activation.").

[32] FTZM § 4.13(a) ("If the zone is a corporation and the change in ownership does not result in a new corporate entity with a different corporate charter, the change will be treated as a name change as described in Section 4.13(b) . . . . If the firm is a corporation and the change results in a new corporate entity, a new application for activation shall be made under the procedures in 19 CFR 146.6 and Section 4.12 FTZM.").

The regulations explain the process for deactivating an FTZ. *Deactivation* is defined as the "voluntary discontinuation of the activation of an entire zone or subzone by the grantee or operator."[33] The grantee or operator must apply in writing to deactivate the zone, which Customs will not do unless all merchandise has been removed from the zone at the risk and expense of the operator.[34] The operator must submit a blueprint of the exact site to be deactivated, and Customs may require an accounting of all merchandise in the zone as a precondition to approving the deactivation.[35] Finally, deactivation stands in contrast to the regulations' concept of *suspension*—an action that Customs may impose on an operator for failing to follow its rules or orders.[36] Deactivation represents a voluntary—and suspension an involuntary—discontinuation of a zone's activated status.

**B**

Harris County reasons that Customs' letter rulings establish that Pasadena-DE ceased to exist as a result of the mergers in August 2006; that Subzone 84-N did not have an authorized operator as of that time; that without an operator, no goods were properly admitted into the subzone; and that Pasadena was therefore not tax-exempt. Pasadena counters that Customs' letters indicate only that new operator approval was required, not that Subzone 84-N was deactivated.

---

[33] 19 C.F.R. § 146.1(b).

[34] *Id.* § 146.7(b).

[35] *Id.*

[36] *Id.* § 146.82(a) ("The port director may suspend for cause the activated status of a zone or zone site . . . ."); *see also* FTZM § 13.8(a)(2) (Customs may suspend the activation of a zone if the operator "neglects or refuses to obey any . . . order, rule, or regulation relating to the operation or administration of a zone").

8

Though Customs' 2009 letter ruling required operator approval, its letters for several years afterward treated Subzone 84-N as activated, deferring a final decision on deactivation through an administrative process that did not conclude until April 2013. In the interim, Customs repeatedly issued Pasadena monthly extensions to operate Subzone 84-N, allowed Pasadena's inventory to enter without paying duties, and supervised Pasadena's activities.[37] None of these activities are consistent with deactivating Subzone 84-N. Customs both determined that Pasadena was a new operator required to apply for approval and allowed Pasadena to operate Subzone 84-N for the review period leading up to that determination.

Harris County's focus on the letter rulings ignores the bigger picture. After Pasadena-DE became Pasadena, it both sought approval and, alternatively, argued that none was necessary.[38] In 2009 and again in 2013, Customs advised Pasadena that new approval was required, but Customs did not deny Pasadena's application to continue its operation, took no action to stop Pasadena from operating the refinery, continued to treat those operations as allowed by federal law, and did not deactivate Subzone 84-N until August 2013. Until then, Pasadena continued to operate the refinery as it always had. Pasadena's inventory enjoyed the benefits of zone status that entire time. Under the FTZ regulations, those benefits could not have continued unless 84-N was activated.[39]

---

[37] Pasadena was audited twice, in March 2010 and July 2013, for compliance with the federal rules and regulations governing Subzone 84-N.

[38] *See* FTZM § 4.13(a) (distinguishing an operator's mere name change from a change resulting in a new corporate entity requiring the operator to submit a new application for activation).

[39] *See* 15 C.F.R. § 400.1(c) ("To the extent zones are 'activated' . . . [they] are treated for purposes of the tariff laws and customs entry procedures as being outside the customs territory of the United States."); FTZM § 4.1 (Customs must approve activation before merchandise may be admitted with zone status and enjoy benefits conferred under the Act).

Harris County argues that if Subzone 84-N remained activated, Customs would not have required Pasadena to apply for approval of a new activation. But if Subzone 84-N was deactivated by the 2006 mergers, Customs had no need to deactivate Subzone 84-N in August 2013. Harris County points to the word voluntary in the definition of deactivation[40] to suggest that the regulations, by implication, contemplate the involuntary discontinuance of a zone's activated status, which it further contends happened here. But Customs did not deactivate Subzone 84-N—involuntarily or otherwise—because it treated 84-N as uninterruptedly activated until August 2013. Before merchandise may be admitted into a zone, or manufactured or processed once in a zone, certain request forms must be submitted to and approved by Customs.[41] Customs approved all of Pasadena's requests to admit crude oil with zone status and all of Pasadena's requests to process the admitted crude oil. In light of this evidence, we conclude that Customs never implicitly deactivated 84-N, as Harris County contends.

Harris County's theory of implied involuntary deactivation also overlooks the concept of suspension in the FTZ regulations—an express mechanism by which Customs can involuntarily discontinue the activation of a zone. Customs may suspend the activated status of a zone if the operator fails to comply with any "order, rule, or regulation relating to the operation or

---

[40] 19 C.F.R. § 146.1(b) ("'Deactivation' means *voluntary* discontinuation of the activation of an entire zone or subzone by the grantee or operator." (emphasis added)).

[41] *Id.* § 146.32(a)(1) ("Merchandise may be admitted into a zone only upon application on a uniquely and sequentially numbered [Customs] Form 214 . . . ."); *id.* § 146.52(a) ("Prior to any action, the operator shall file with the port director an application . . . on Customs Form 216 for permission to manipulate, manufacture, exhibit, or destroy merchandise in a zone.").

administration of a zone".[42] Harris County argues that Pasadena failed to comply with the FTZ regulations, but Customs indisputably never suspended operations in Subzone 84-N. We decline to read into the regulations a third, unwritten method for discontinuing the activated status of FTZs.

The formal procedures of deactivation and suspension serve the vital purpose of ensuring that Customs maintains operational control and supervision of goods entering the United States.[43] If deactivation could occur implicitly or informally, Customs could not keep clear records of which areas are within the customs territory of the United States and which are exempt from duty payments.[44] Because the Port did not ask that 84-N be deactivated until August 2013, and Customs never suspended it, 84-N remained activated during the challenged tax years.

Section 4.12(a) of the FTZ Manual further supports this conclusion by directing that an existing operator is to remain responsible for an activated zone until there is a new operator approved or the zone is suspended or deactivated:

> Interim Responsibility of Existing Operator – The existing Operator remains responsible for merchandise in zone status and for compliance with the laws and regulations, under its Operator's bond until the new Operator is approved and a new bond is executed. The existing Operator is relieved of responsibility in the interim only if the zone is deactivated or activated status is suspended, and all merchandise in zone status . . . has been removed from the zone or entered for consumption.

---

[42] FTZM § 13.8(a)(2).

[43] These formal procedures also protect operators. For example, if Customs had not granted Pasadena temporary authority to operate 84-N and then decided that it was not a new operator, Pasadena would have had no way to recover the tax benefits it necessarily would have lost.

[44] An emphasis on recordkeeping is pervasive throughout the FTZ regulations. *See, e.g.*, FTZM §§ 7.1–7.13 (Operator Recordkeeping and Reporting Responsibilities).

This section evinces a policy of stable transition if there is ever a proposed change in operators. By ensuring that a party is responsible for the zone at all times, Customs is better able to control and supervise merchandise entering and leaving the customs territory of the United States, which we have explained is critical. Section 4.12(a) must apply to any successor of an existing operator; otherwise, there would be no responsible party and the risks associated with implicit deactivation are implicated. A successor operator's right to operate a zone on a permanent basis is not a matter of contract; Customs must approve it. But the successor remains provisionally responsible until Customs deactivates or suspends the zone or approves a new application.

Pasadena, as acting operator of Subzone 84-N, remained responsible for the zone until Customs reached a final decision on whether approval of a new operator was required. Once Customs confirmed that Pasadena was a new operator, and the Port declined to concur with its application, the application was not approved, and Subzone 84-N was formally deactivated. Pasadena's responsibilities terminated only after deactivation was approved by Customs and all inventory was removed at Pasadena's expense. The stable transition envisioned by § 4.12(a) was implemented in this case.

\*  \*  \*  \*  \*

Pasadena's tax-exempt status did not terminate until Subzone 84-N was deactivated in August 2013. We reverse the court of appeals' judgment and render judgment for petitioner.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: February 28, 2020